42 F.3d 1444
 46 Soc.Sec.Rep.Ser. 267, Medicare & Medicaid Guide
P 42,942
REHABILITATION ASSOCIATION OF VIRGINIA, INCORPORATED,
Plaintiff-Appellee,
v.
Bruce U. KOZLOWSKI, Director of Virginia Department of
Medical Assistance Services, Defendant-Appellant,
and
Donna E. Shalala, Secretary of Health and Human Services, Defendant.
REHABILITATION ASSOCIATION OF VIRGINIA, INCORPORATED,
Plaintiff-Appellee,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
Defendant-Appellant,
and
Bruce U. Kozlowski, Director of Virginia Department of
Medical Assistance Services, Defendant.
 Nos. 93-2572, 94-1134.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 8, 1994.
Decided Dec. 5, 1994.
 
 ARGUED: Richard Alan Olderman, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellant Secretary; William Henry Hurd, Deputy Atty. Gen., Office of the Atty. Gen., Richmond, VA, for appellant Kozlowski. Peter F. Nadel, Rosenman & Colin, New York City, for appellee. ON BRIEF: Frank W. Hunger, Asst. Atty. Gen., Helen F. Fahey, U.S. Atty., Barbara C. Biddle, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellant Secretary; James S. Gilmore, III, Atty. Gen. of VA, Pamela M. Reed, Asst. Atty. Gen., Office of the Atty. Gen., Richmond, VA, for appellant Kozlowski. Joseph V. Willey, Rosenman & Colin, New York City, David G. Shuford, Mays & Valentine, Richmond, VA, for appellee.
 Before ERVIN, Chief Judge, and NIEMEYER and WILLIAMS, Circuit Judges.
 Affirmed by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge WILLIAMS joined. Judge NIEMEYER wrote a concurring and dissenting opinion.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 Rehabilitation Association of Virginia, Inc. (the Association) brought this suit against Bruce Kozlowski, director of Virginia's Department of Medical Assistance Services (Virginia), and Donna Shalala, Secretary of the United States Department of Health and Human Services (DHHS or the Secretary) challenging the legality of certain aspects of Virginia's Medicaid plan and seeking prospective injunctive relief. On cross-motions for summary judgment, the district court entered judgment in favor of the Association, and Virginia and DHHS now appeal. 838 F.Supp. 243. For the reasons set forth below, we affirm.
 
 I.
 
 2
 Briefly stated, Medicare, Title XVIII of the Social Security Act, 42 U.S.C. Secs. 1395-1395ccc, is a federally-run program, enacted in 1965, to provide financing for medical procedures for certain disabled individuals and people 65 years of age. 42 U.S.C. Secs. 426(a), 1395c. Medicare has two parts, Part A and Part B. Part A, 42 U.S.C. Secs. 1395c to 1395i-4, provides reimbursement for inpatient hospital care and related post-hospital, home health and hospice care. 42 U.S.C. Sec. 1395d. Enrollment in Part A is essentially automatic. Part A includes limited cost-sharing provisions in the form of annual deductibles for inpatient hospital service and payments by enrolled individuals of an amount of "coinsurance" that depends on the length of hospital stay. 42 U.S.C. Sec. 1395e. In addition, some individuals who do not directly meet the basic criteria for enrollment may enroll and are required to pay premiums. 42 U.S.C. Secs. 1395i-2, 1395i-2a.
 
 
 3
 Medicare Part B, 42 U.S.C. Secs. 1395j to 1395w-4, is a supplemental voluntary insurance program. Under Part B, individuals entitled to Part A benefits and certain others, see 42 U.S.C. Sec. 1395o, may purchase supplementary insurance for hospital out-patient services, physician services, and other medical services not covered under Part A. 42 U.S.C. Sec. 1395k. Part B also includes a series of cost-sharing provisions. Enrollees must pay a monthly premium and an annual deductible, currently $100. 42 U.S.C. Secs. 1395l (b), 1395r. (There is an exemption from the application of the annual deductible for certain services, see 42 U.S.C. Sec. 1395l (b)). As to payments of charges after the deductible is exhausted (or where it does not apply), the federal government will pay 80% of the "reasonable charge" for the services. 42 U.S.C. Sec. 1395l (a). The amount that constitutes a reasonable charge is set annually by the Secretary. 42 U.S.C. Sec. 1395w-4. The service provider can charge the beneficiary for the remaining 20% of the reasonable charge. Id. This charge is usually referred to as a copayment or coinsurance. If the physician is a participating physician, he "takes assignment" in Medicare parlance, and cannot charge an amount greater than the reasonable charge. If the physician does not take assignment, the physician's fee may exceed the "reasonable charge" for the service provided, and the doctor may bill the patient for not only the difference between the reasonable charge and the federal payment, but also the difference between the actual charge and the reasonable charge as well. This is commonly referred to as "balance billing."
 
 
 4
 Also enacted in 1965, Medicaid, Title XIX of the Social Security Act, 42 U.S.C. Secs. 1396-1396v, established a federal-state cooperative cost-sharing program to provide necessary medical assistance to families and individuals with insufficient income and resources. While a state's participation in Medicaid is not mandatory, once a state does enter into an agreement with the United States it receives federal funds for its Medicaid program. Participating states are required to comply with the Medicaid Act and its implementing regulations issued by the DHHS. 42 U.S.C. Secs. 1396a, 1396c.
 
 
 5
 Under Medicaid, each state develops a schedule or methodology that establishes the fee that the state will pay a service provider for every item or service covered under the state's Medicaid plan. Where Medicare and Medicaid cover the same services, the state Medicaid fee amount is almost always less than the reasonable charge for services that the federal government sets for Medicare reimbursement; it is also generally even less than the 80% of the reasonable charge figure that the government pays under Medicare's Part B insurance plan. Service providers who participate in the Medicaid program are required to accept payment of the state-denoted Medicaid fee as payment in full for their services, i.e., they are required to take assignment, and may not attempt to recover any additional amounts elsewhere. Medicaid is essentially a payer of last resort, and one of the requirements of a state Medicaid plan is that it attempt to identify and collect other insurance or source of health care funding available to a Medicaid participant (i.e., a form of subrogation). 42 U.S.C. Sec. 1396a(a)(25).
 
 
 6
 The Medicaid and Medicare statutes intersect for coverage of the population of the disabled or people 65 or over (eligible for Medicare) who are also poor (eligible for Medicaid). These people are called dual eligibles or crossovers. In addition, there is another group of whom we must take notice, called the "qualified medicare beneficiaries" or QMBs. As originally defined, QMBs included persons eligible for Medicare and who met certain statutory requirements of poverty, but who did not meet a state's eligibility requirement for Medicaid; they are referred to as "pure QMBs." Subsequently, the definition of QMB was changed so that ineligibility for Medicaid was removed; as such, the current definition of QMBs embraces two subsets of individuals: Medicare eligibles who are also eligible for Medicaid benefits (i.e., dual eligibles), and Medicare eligibles who are not eligible for Medicaid benefits but who meet certain criteria of poverty (i.e., pure QMBs).[1] For the sake of clarity, we use the term QMBs to refer to both subgroups, and refer to one or the other subgroup only by its identified name.
 
 
 7
 While QMBs are, by definition, eligible for Medicare Part A enrollment and Part B insurance coverage, because they are impoverished there exists the very real danger that they will be unable to afford to buy themselves the Part B supplementary health coverage or pay Part A or Part B's deductibles or coinsurance amounts. Thus, the people for whom the safety net is most needed are also those who, left to their own, could not place themselves within its embrace. Since the outset, at least as to dual eligibles, the Medicare and Medicaid statutes have addressed this problem. The response was to create a "buy-in" program, under which states participating under Medicaid use Medicaid funds (i.e., state funds for which federal matching funds under Medicaid are available) to pay the premiums to enroll the QMB[2] in the Medicare Part B insurance program (or the premium to enroll in Part A coverage for those people for whom the statute so required), and pay the deductibles and coinsurance payments that beneficiaries subsequently incurred under Part A or Part B. For dual eligibles, the state gets a real deal, because, given that Medicaid is treated as a payor of last resort, by enrolling dual eligibles for Part B coverage, the primary financial payment for services received comes from the federal government for any services that are covered under both Medicare and Medicaid. In other words, states use their Medicaid dollars, some of which are themselves federal in origin, to buy their QMBs into the federal program, thus shifting the primary payment for costs from the state Medicaid program to the federal Medicare program.
 
 
 8
 Thus, for a QMB, the state buys the individual into Medicare Part B insurance by paying the premiums for Part B insurance as well as the annual deductible. When the beneficiary incurs costs for services covered by Medicare ("Medicare services") above the deductible, the federal government pays 80% of the reasonable costs of the Medicare services received. The central question in this lawsuit involves the remaining 20%, i.e., the copayment representing the difference between the federal government's payment and the total amount of the "reasonable charge" that usually would be paid by the beneficiary but for the fact that the beneficiary is too poor to pay this amount herself. The difficulty arises from the fact that, as noted above, the Medicaid fee for a service is almost always lower than the Medicare reasonable charge. When that is the case, is the state required to reimburse the service provider for the entire 20% of the Medicare reasonable charge not covered by the federal payment, or is it only required to reimburse any difference between the federal 80% and the Medicaid reimbursement fee for that service?[3] In other words, is the formula for the state's contribution:
 
 
 9
 Medicare reasonable charge - federal Medicare contribution
 
 
 10
 or is it:
 
 
 11
 state Medicaid fee - federal Medicare contribution?
 
 
 12
 The selection of one formula over the other involves the characterization of the program as either primarily a Medicare program or primarily a Medicaid program. To say that the state is required to contribute the 20% difference is to see the program as being a Medicare program that is being partially financed with Medicaid dollars. To say that the state only has to contribute funds to bring the payment to the Medicaid amount, which means in some instances that the state need pay nothing, because the Medicaid cap is below the amount of the federal Medicare contribution, is to see the program either as a Medicaid program using primarily federal funds or, using the payor of last resort approach, to see it as a Medicaid program[4] where the 80% federal Medicare amount is viewed simply as a third party "primary" insurance program (that is not paying the amount that it is statutorily supposed to pay), essentially ignoring the 20% beneficiary/state contribution, and viewing the state contribution as a "pure" Medicaid contribution rather than Medicaid funds going for reimbursement of Medicare services.
 
 
 13
 The position taken by the Secretary is that the state contribution requirement ends at the level of the state's Medicaid fee cap. As a result, some states have altered their Medicaid plans relating to buy-ins accordingly. As of January 1, 1991, Virginia pays all of a QMB's Medicare Part B premium and deductible, but pays a QMB's coinsurance only to the extent that the Medicaid rate for the service provided exceeds the amount the federal government pays under Part B. Thus, providers of Medicare services to QMBs do not receive the same payment for their QMB patients as for all other Medicare patients, but instead are eligible under the Virginia plan only to receive the greater of 80% of the Medicare fee or the full Medicaid fee, provided that the Medicaid fee is no greater than 100% of the Medicare fee.[5]
 
 
 14
 In addition to computing fees for Medicare services received by QMBs based on the Medicaid rate, the current Virginia plan does not directly reimburse physical therapy providers of the type who are the plaintiffs in this suit. The plan prohibits rehabilitation agencies from billing the Virginia Department of Medical Assistance Services (the state Medicaid administrator) directly for the amount owed for Medicare Part B deductibles and coinsurance on behalf of QMBs. Instead, the rehabilitation agencies must seek reimbursement for such amounts from the nursing facilities in which the beneficiaries are located, which are expected to submit those amounts to the state agency in their cost reports. The state agency then bundles these costs into a per diem rate paid to the nursing facility. Unfortunately, there is a per diem cap on nursing facility fees, and there is little prospect in reality that the bundling contemplated in fact occurs.
 
 
 15
 The Association, which is an association of rehabilitation service providers in Virginia, brought this suit seeking only injunctive relief against Kozlowski, head of the Virginia Medicaid program, and Shalala, head of the federal Medicare and Medicaid programs, under both the Medicare and Medicaid statutes directly as well as under 42 U.S.C. Sec. 1983, alleging violations of the Medicare and Medicaid provisions in both the adoption of the Medicaid cap on QMB Part B reimbursement as well as in Virginia's payment program to nursing facilities rather than directly to the actual providers. The state offered several affirmative defenses including lack of standing and Eleventh Amendment immunity. On cross motions for summary judgment, the district court found for the Association on both the cap amount as well as the payment system, and ordered Virginia to utilize the 20% Medicare figure as the reimbursement amount and to pay such reimbursement directly. Virginia and DHHS appealed, and this court stayed the mandate of the district court's order pending resolution on appeal.
 
 II.
 
 16
 We begin with Virginia's two defenses to this suit, both of which may be handled with dispatch. First, Virginia claims that the suit must fail because it is barred by the Eleventh Amendment. The suit seeks prospective, injunctive relief only, rather than any form of retroactive compensatory damages, and is brought against Kozlowski, not the State. Such a suit is allowed under Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and their progeny, and this defense is completely meritless.
 
 
 17
 Second, Virginia again asserts that the Medicaid and Medicare Acts do not provide standing to the rehabilitation providers to bring this suit under Sec. 1983. We need not tarry over this argument, for it already has been decided, both by this circuit and by the Supreme Court. In Virginia Hosp. Ass'n v. Baliles, 868 F.2d 653 (4th Cir.1989), aff'd sub nom. Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), Virginia asserted that the Virginia Hospital Association lacked standing to challenge Virginia's rates under the Boren Amendment, 42 U.S.C. Sec. 1396a(a)(13)(A). Both this court and the Supreme Court rejected that contention, finding that the provision in question created enforceable rights on behalf of the service providers. The analysis set out in those opinions as to the Boren Amendment is equally applicable in this instance to the related QMB provisions of 42 U.S.C. Secs. 1396a(a)(10)(E), 1396d(a), 1396d(p). Where the state refuses to pay what the providers insist is the proper amount of the copayment for QMBs required under the Medicaid Act, the providers have standing to challenge the state's interpretation of the relevant provisions.
 
 III.
 
 18
 There can be no doubt but that the statutes and provisions in question, involving the financing of Medicare and Medicaid, are among the most completely impenetrable texts within human experience. Indeed, one approaches them at the level of specificity herein demanded with dread, for not only are they dense reading of the most tortuous kind, but Congress also revisits the area frequently, generously cutting and pruning in the process and making any solid grasp of the matters addressed merely a passing phase.
 
 
 19
 It is thus with some sympathy that we read the Secretary's brief, which calls the court to defer to her expert judgment under the aegis of Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Nevertheless, while Chevron is regularly cited by administrative agencies as a backstop to support their positions, it must be clear that that case did not replace Article III of the Constitution. As the opinion in Chevron makes clear:
 
 
 20
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress had directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.[9] If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 21
 Id. at 842-43, 104 S.Ct. at 2781-82 (citations and footnotes omitted). The task in the first instance for this court therefore is to examine the statute to determine whether the statute clearly speaks to the question of the amount of the Medicare copayment for which a state is responsible under the Medicare buy-in provisions. It is only if the statute is silent or ambiguous that we must look to the Secretary's interpretation to provide guidance.
 
 
 22
 The particular provisions involved in this case have been the subject of repeated tinkering by Congress, and on each occasion the legislative history has provided some information that contradicts other information as to Congressional intent. As noted below, there is a particular element of "Congressional dicta" in the form of post-enactment legislative history involved in these cases that requires an accounting. Both the Secretary and the Association are to be commended on their briefs, and each offers a reasonably good explanation of the development of the statutes over time, but they are contradictory stories in important respects. Given the extensive changes that have occurred to these statutes over time, the only way to explain the present posture is to begin at the creation and work forward through those changes.
 
 A.
 
 23
 The Social Security Amendments of 1965 included in a single massive bill the initial Medicaid and Medicare provisions. The buy-in provision appeared in Sec. 121(a). It stated:
 
 
 24
 A State plan for medical assistance must--
 
 
 25
 * * * * * *(15) in the case of eligible individuals 65 years of age or older who are covered by either or both of the insurance programs established by [Medicare], provide--
 
 
 26
 (A) for meeting the full cost of any deductible imposed with respect to any such individual under the insurance program established by part A of such title; and
 
 
 27
 (B) where, under the plan, all of any deductible, cost sharing, or similar charge imposed with respect to any such individual under the insurance program established by part B of such title is not met, the portion thereof which is met shall be determined on a basis reasonably related (as determined in accordance with standards approved by the Secretary and included in the plan) to such individual's income or his income and resources.
 
 
 28
 Social Security Amendments of 1965, Pub.L. No. 89-97, Sec. 121(a), 70 Stat. 286, 1965 U.S.C.C.A.N. 305, 370-73 (codified prior to repeal at 42 U.S.C. Sec. 1396a(a)(15)). As to Medicare Part A, this provision is straightforward: the state must pay the full deductible. As to Part B, the parties read it differently. The Association reads it to mean that a state can pay the full amount of the deductible and cost-sharing under Part B; however, the state can also pay less than the full amount, but if it does so, it must still pay something of the amount due, and the amount it must pay is to be based on a figure reasonably related to the beneficiary's income. In no event, anyway, can it not pay at all. The Secretary, on the other hand, interprets this provision to mean that state contribution towards Part B was completely optional.[6]
 
 
 29
 We believe it clear, based on the plain language of the statute and the commentary in the legislative history that the Association's interpretation is the correct one. The language of the statute seems clearly to indicate that if the state pays less than all of the deductible or cost sharing under the buy-in provision, "the portion thereof which is met shall be determined on a basis reasonably related ... to such individual's income or his income and resources." Two points confirm this reading. First, we believe that the legislative history eliminates any ambiguity that the statute contains. The general discussion of the bill includes the following commentary:
 
 
 30
 A State medical assistance plan may provide for the payment in full of any deductibles or cost sharing under the insurance program established by part B of title XVIII. In the event, however, the State plan provides for the individual to assume a portion of such costs, such portion shall be determined on a basis reasonably related to the individual's income, or income and resources and in conformity with standards issued by the Secretary. The Secretary is authorized to issue standards--under this provision which, it is expected, will protect the income and resources of the individual needed for his maintenance--to guide the States. Such standards shall protect the income and resources of the individual needed for his maintenance and provide assurance that the responsibility placed on individuals to share in the cost shall not be an undue burden on them.
 
 
 31
 S.Rep. No. 404, 89th Cong., 1st Sess., 1965 U.S.C.C.A.N. 1943, 2020 (emphasis supplied). The emphasized elements clearly disclose a Congressional intent that the language of the statute did not allow the states to opt out of the buy-in. Second, both the statute and the commentary provide for the Secretary to establish rules as to how much less the State can pay if it pays less than everything. If the statute allowed a state to pay nothing, it would be quite odd for the statute to then require the Secretary to establish strict regulations as to how much the state has to pay once it gets into the game. The whole point of the Secretary's regulations keying the portion of State contribution to the beneficiary's income and resources aims to protect the poor, elderly individual from financial devastation as a result of illness; a reading of the statute allowing the state to opt out entirely vitiates the whole purpose of that provision by allowing the full burden of the copayment to fall on her shoulders.
 
 
 32
 Thus, from the beginning, the statute required state coverage of Part A coinsurance costs to be mandatory and total, while Part B coverage was also mandatory, but not necessarily total. If Part B coverage was less than total, it had to be keyed to the beneficiary's income and resources in accordance with DHHS rules.
 
 B.
 
 33
 In 1967, Congress tinkered with the statute. Section 235(a)(3) of the Social Security Amendments of 1967, Pub.L. No. 90-248, 81 Stat. 821, 1967 U.S.C.C.A.N. 923, 1031, amended 42 U.S.C. Sec. 1396a(a)(15) to remove the differences between state requirements for the treatment of costs under Part A and Part B. It did so by rewriting the statute as follows:
 
 
 34
 A State plan for medical assistance must--
 
 
 35
 * * * * * *
 
 
 36
 (15) in the case of eligible individuals 65 years of age or older who are covered by either or both of the insurance programs established by [Medicare], provide--
 
 
 37
 (A) for meeting the full cost of any deductible imposed with respect to any such individual under the insurance program established by part A of such title; and
 
 
 38
 (B) where, under the plan, all of any deductible, cost sharing, or similar charge imposed with respect to any such individual under the insurance program established by part B of such title is not met, the portion thereof which is met shall be determined on a basis reasonably related (as determined in accordance with standards approved by the Secretary and included in the plan) to such individual's income or his income and resources.
 
 
 39
 Under this provision, Part A and Part B are treated uniformly, and the State may impose a deductible, but, as the accompanying Senate report notes,
 
 
 40
 the effect of the change would be to no longer require that a State plan meet the cost of the deductibles imposed under Part A of [Medicare] and to require that the plan relate any deductibles imposed under the hospital insurance program, as well as the supplementary medical insurance program, of [Medicare] to the income of the individuals covered under the plan.
 
 
 41
 S.Rep. No. 744, 90th Cong., 2d Sess. (1967), reprinted in 1967 U.S.C.C.A.N. 2834, 3142.[7] Congress also broadened the coverage of the program to include all dual eligibles as opposed to simply those receiving cash assistance, see 1967 Amendments Sec. 222(a), (b) (reprinted in 1967 U.S.C.C.A.N. at 1022-23), codified at 42 U.S.C. Sec. 1395v. In addition, Congress made such buy-in agreements essentially mandatory for the states participating in the Medicaid program by providing that the federal government would not provide Medicaid matching funds to cover any costs incurred under the Medicaid program where the individual could have been enrolled in Medicare Part B but was not. Id. Sec. 222(c), 1967 U.S.C.C.A.N. at 1023, now codified at 42 U.S.C. Sec. 1396b(b).
 
 
 42
 Thus, after the 1967 amendments took effect, all dual eligibles could participate in the buy-in program; the States would not receive funds if they did not buy-in their dual eligibles; and the States' required contribution under the buy-in included premiums, and deductibles and cost-sharing on either a full basis or a less than full basis complying with strict rules relating the amount of State contribution to the beneficiary's income and resources. Thus it stood for almost 20 years.
 
 C.
 
 43
 In 1986, Congress revisited this area, and it is here that the strongest disagreements between the parties arise. An extensive series of amendments to the Social Security provisions was included in the Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99-509, 1986 U.S.C.C.A.N. (100 Stat.) 1874 (1986) (OBRA). One series of amendments was designed to allow and encourage the states to expand the coverage of their Medicaid programs to additional needy individuals whose income fell between the SSI limit and the federal poverty line. Because this expansion was entirely voluntary, however, the bill also included a backup provision, which was the initial introduction of QMBs (both the population and the term) into the Medicaid buy-in provision of Medicare. Again at the option of the states, the amendments authorized them to use their Medicaid funds "for medicare cost-sharing ... for qualified medicare beneficiaries...." OBRA Sec. 9403(a), 1986 U.S.C.C.A.N. (100 Stat.) at 2053 (codified as amended at 42 U.S.C. Sec. 1396a(a)(10)(E)(i)). Qualified medicare beneficiaries were defined as individuals eligible for Medicare Part A insurance but not eligible for Medicaid, and who had incomes no greater than a state-determined limit (but that limit could not exceed the federal poverty line) and resources no greater than the maximum for benefits under the supplemental security income program. Id. Sec. 9403(b), 1986 U.S.C.C.A.N. (100 Stat.) 2053-54 (codified as amended at 42 U.S.C. Sec. 1396d(p)(1)).
 
 
 44
 Medicare cost-sharing was explicitly defined in the statute.
 
 
 45
 The term "medicare cost-sharing" means the following costs incurred with respect to a qualified medicare beneficiary:
 
 
 46
 (A) Premiums under part B ...;
 
 
 47
 (B) Deductibles and coinsurance [under Part A];
 
 
 48
 (C) The annual deductible [under Part B];
 
 
 49
 (D) The difference between the amount that is paid under [the relevant payment section of Part B] and the amount that would be paid under such section if any reference to "80 percent" therein were deemed a reference to "100 percent."
 
 
 50
 Id. Sec. 9403(d), 1986 U.S.C.C.A.N. (100 Stat.) at 2054 (codified at 42 U.S.C. Sec. 1396d(p)(3)). Part (D) of the definition seems quite strongly to indicate that the cost-sharing requirement included all of the copayments, i.e., the difference between the federal 80% payment and 100% of the reasonable charge.
 
 
 51
 This is not the end of the matter, however. Another amendment provision stated that "the medical assistance made available to a qualified medicare beneficiary ... shall be limited to medical assistance for medicare cost-sharing ..., subject to the provisions of subsection (n) and [42 U.S.C. Sec. 1396o ]." Id. Sec. 9403(c), 1986 U.S.C.C.A.N. (100 Stat.) 2054 (codified at numeral VIII after 42 U.S.C. Sec. 1396a(a)(10)(E)). The first half of this sentence makes perfect sense: it merely says that QMBs get state support for Medicare cost-sharing, and don't get to "piggy-back" that into full Medicaid support they are not otherwise eligible to receive under the state Medicaid program. This is placed among a series of provisions set down in text form following 42 U.S.C. Sec. 1396a(a)(10), which is the subsection that lists various groups that a state's Medicaid plan must cover. All of these items, set off by roman numerals in the subsequent text, are intended to clarify that the fact that some groups are required to receive certain benefits under the state Medicaid plan doesn't mean that other groups must be afforded identical benefits. The justification for all of these clarifiers arises from Congress' initial concern that the states not provide better Medicaid benefits to the more well off than to the abject poor, and its response through the inclusion in the statute of a requirement that no group get a better set of benefits than any other group. Of course, with some groups, however, Congress itself wanted better or different benefits provided, and once it recognized this tension was causing consternation among the states, it began in the 1967 amendments to insert these provisions to overcome the equality of benefits provision. See note 7, supra. Thus, this provision simply indicates, among the other clarifiers, that QMBs, who definitionally were not qualified for state Medicaid benefits, could obtain Medicaid assistance to get them into Medicare Part B and nothing more.
 
 
 52
 The second half of the sentence, "subject to the provisions of [42 U.S.C. Sec. 1396a(n) ] and [42 U.S.C. Sec. 1396o ]," is somewhat more difficult to understand. As passed in 1986 under OBRA, 42 U.S.C. Sec. 1396a(n) provides:
 
 
 53
 In the case of medical assistance furnished under this title for medicare cost-sharing respecting the furnishing of a service or item to a qualified medicare beneficiary, the State plan may provide payment in an amount with respect to the service or item that results in the sum of such payment amount and any amount of payment made under [Medicare] with respect to the service or item exceeding the amount that is otherwise payable under the State plan for the item or service for eligible individuals who are not qualified medicare beneficiaries.
 
 
 54
 COBRA Sec. 9403(e), 100 Stat. 2054-55 (emphasis supplied). The Secretary and Virginia lean very heavily on the word "may." In their view, the fact that the statute says that the "State plan may provide payment" means that it may, but it doesn't have to, pay an amount that exceeds the Medicaid fee schedule amount for the particular item or service in question. The Association, on the other hand, sees the "may" as being simply a lifting of a barrier; while states under Medicaid are not allowed to pay more than the plan amount, the statute here, to clarify any confusion about whether the state may pay the full 20% included as an item in the Medicare cost sharing definition, tells the state that it may in this instance go ahead and break the barrier. Although we believe that the Association's explanation is highly plausible, given the connection between this provision and those allowance provisions set out in text form after Sec. 1396a(a)(10), we believe that a better understanding appears for this provision.
 
 
 55
 Neither the Secretary's nor the Association's explanation grasps one of the central problems with this provision: at the time it was enacted, it only applied to pure QMBs and not to dual eligibles. Dual eligibles, definitionally distinct from the QMBs, were governed by 42 U.S.C. Sec. 1396a(a)(15), which did not have any qualifier or reference to Sec. 1396a(n). Thus, under the Secretary's explanation of Sec. 1396a(n), the pure QMBs would be subject to this discretionary cap, while the dual eligibles would not be. There is no logical reason for such a distinction, and we find no explanation in the legislative history to support such a differentiation. Under the Association's approach, on the other hand, it is hard to explain why the states needed permission to break the Medicaid fee cap for QMBs when Congress didn't apparently think before this time that such permission was needed for dual eligibles. Neither interpretation is particularly satisfying.
 
 
 56
 What both have in common, however, is what appears to be an erroneous assumption about the difference to which the statute actually refers. Both parties assume that the Sec. 1396a(n)'s language, "eligible individuals who are not qualified medicare beneficiaries," means that the statute is saying that the State may pay more for QMB payments under Part B than it pays for regular Medicaid payments for the same service. Thus, the comparison is Medicare Part B versus Medicaid. But "eligible individuals who are not qualified medicare beneficiaries" refers more logically to dual eligibles. This understanding of the statute suggests simply that the State may pay more for QMB payments under Plan B than it pays for dual eligibles under Plan B. While somewhat incongruous on first impression, the complicated statutory provisions of Medicaid explain this rule. While it appears that the state must pay all of the copayment and deductible under the Medicare cost-sharing definition for QMBs (with a small caveat, discussed below), under the dual eligible provision the state is allowed to impose a small charge to the beneficiary if it chooses not to pay the whole amount, as discussed in part II.A, supra. If a state exercised that option, it would be paying more for the QMB than for the dual eligible, and this provision appears to be merely stating that that is an allowable situation.
 
 
 57
 This approach is further confirmed by referring to the other provision to which the QMBs were "subject." Without getting into much detail, 42 U.S.C. Sec. 1396o relates to a state's ability to impose certain charges on certain plan participants for certain services. It allows for "nominal" charges, in the form of "deductions, cost sharing, or similar charge" to be made to QMBs for their Medicare Part B coverage through the Medicaid plan. This section provides greater harmony between the dual eligibles, who were covered totally or at a lower amount where the lower amount was keyed to income and resources, and QMBs, who could, under Sec. 1396o, be charged some nominal amount. Because the amounts of nominal charges in either category were not necessarily set at the same levels, Sec. 1396a(n) simply allowed for the situation where the QMB was charged less than the dual eligible, so that the state paid more for QMBs.
 
 
 58
 The legislative history of these 1986 provisions indicates in strong terms that Congress did not view the QMB provision to allow the state to pay only some portion of the copayment amount. In outlining the scope of the QMB program, the House report indicated that "States would be permitted to pay just for the Medicare Part B premium and the other Parts A and B cost-sharing requirements for Medicare beneficiaries." H.R.Rep. No. 727, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 3607, 3695. While the surrounding paragraphs were designed to explain how limited the states' responsibility was for this program (which was being billed as a cheaper alternative than expanding Medicaid), and explained other ways the program was modest in character ("States would determine whether they wished to offer this assistance and, if so, where to set the income eligibility standards," id.), it did not note that the State contribution could be discretionarily limited as well, certainly a strong selling point when attempting to emphasize the limited nature of the new option.
 
 
 59
 Perhaps more tellingly, the House report contains an extended discussion of the payment mechanics under this provision that contemplates a number of hypothetical situations, none of which include the state paying less than the whole 20%:
 
 
 60
 For elderly and disabled individuals whom the State chose to cover, the Medicaid program would pay for the Part B deductible and the beneficiary's 20 percent coinsurance on Part B services. If the beneficiary uses a physician who takes assignment, Medicaid would pay the physician directly for the 20 percent coinsurance and the patient could not be billed for any amounts above the Medicare reasonable charge. However, if the physician elects not to take assignment, the beneficiary would submit the claim for the 20 percent coinsurance requirement to the State Medicaid program and would be liable for an additional amount charged by the physician. The Committee therefore encourages the States to make available to the elderly and disabled assisted under this provision a list of physicians in their communities who will agree to accept assignment.
 
 
 61
 Id., 1986 U.S.C.C.A.N. at 3696 (emphasis supplied). The language clearly evinces a desire by the Committee to protect the eligible individuals; its discussion certainly would have noted their possible liability for part or all of the 20% if such liability existed. Thus, neither the discussion of the bill explaining the limited additional burden QMB buy-ins would pose, nor the discussion of the payments required of the QMBs themselves, mentions the possibility that this provision would allow the state to pay less than the full 20%; in contrast, the language overwhelmingly suggests that the full amount must be paid.
 
 D.
 
 62
 In 1988, Congress acted thrice with respect to the buy-in program. First, it made the QMB buy-in provision mandatory rather than optional by striking out "at the option of the State" from the beginning of 42 U.S.C. Sec. 1396a(a)(10)(E). Medicare Catastrophic Coverage Act of 1988, Pub.L. No. 100-360, Sec. 301(a)(1), 1988 U.S.C.C.A.N. (102 Stat.) 683, 748.[8] At the same time, it expanded the definition of QMBs by increasing the maximum income level (to 100% of the poverty line, with no option for the states to set the eligibility line lower) and resource amount (from one to two times the supplemental security income program maximum). Id. Sec. 301(b), (c), 1988 U.S.C.C.A.N. (102 Stat.) at 748-49.
 
 
 63
 That is basically all that Congress did on its first consideration of the matter.[9] The House Report accompanying the bill, however, goes far beyond a simple explanation of these minor amendments to the statute. It begins by explaining that Congress was lightening the load on state Medicaid programs by expanding the Medicare coverage of catastrophic care, and used this as its justification for imposing the mandatory QMB buy-in requirement on the States as a cost-effective use of the states' saved resources. It included language, set out in the margin, that suggested that the states' payments would cover all of the amounts of copayments.[10] Yet it then proceeded to state, in unequivocal terms, an understanding of the buy-in program such that the states did not need to pay above the Medicaid cap:
 
 
 64
 The bill would require States to pay Medicare cost-sharing, including coinsurance, on behalf of eligible individuals. It is the understanding of the Committee that, with respect to dual Medicaid-Medicare eligibles, some States pay the coinsurance even if the amount that Medicare pays for the service is higher than the State Medicaid payment rate, while others do not. Under the Committee bill, States would not be required to pay the Medicare coinsurance in the case of a bill where the amount reimbursed by Medicare--i.e., 80 percent of the reasonable charge--exceeds the amount Medicaid would pay for the same item or service. However, if a State chooses to pay some or all of the coinsurance in this circumstance, Federal matching funds would, as under current law, be available for this cost. For example, assume that a physician actually charges a "buy-in" patient $60 for performing a particular procedure; that Medicare recognizes $50 as the reasonable charge; and that the State Medicaid program only pays $35 for this procedure. Whether or not the physician takes assignment, Medicare will pay only 80 percent of $50, leaving a $10 coinsurance obligation for the beneficiary. However, since the State only recognizes $35 as the fee for the procedure in question, and since the Medicare program has already paid the physician $40, the State is not required to pay any of the $10 coinsurance. If the State chooses to pay some or all of the $10, however, its cost would qualify for Federal matching payments at the regular rate for services.
 
 
 65
 Id. at 61, 1988 U.S.C.C.A.N. at 884. While we understand the meaning of this language, the difficult question is as to its effect. First, it must be noted again that the only reading of the statute that allows a state to pay less than the full Medicare copayment amount emerges from Sec. 1396a(n); that provision, however, did not apply to dual eligibles, and as such, the understanding stated in the report is clearly not correct. Second, as noted above, these amendments that the report accompanied were quite minor, dropping out "at the option of the State" and tinkering with the parameters of the QMB population. Thus, the actual legislation enacted was not the sort that could graft this Medicaid cap onto what was previously there. The question thus becomes whether this report language should influence the interpretation as to previous enactments. We think that it should not. This wrenching change to a statute's meaning that had been stable for 20 years points precisely to the pitfalls of relying on "post enactment legislative history," which Justice Scalia recently has characterized, quite appropriately, as an oxymoron. United States v. Carlton, --- U.S. ----, ----, 114 S.Ct. 2018, 2026, 129 L.Ed.2d 22, 34 (1994) (Scalia, J., concurring); see also Pereira by Pereira v. Kozlowski, 996 F.2d 723, 726-27 (4th Cir.1993). To the usual comparison of laws and sausages a new observation must be added: as our eating habits become healthier, and less filler is added to the making of sausage, so more is added to the making of law. See, e.g., Landgraf v. USI Film Prods., --- U.S. ----, ---- - ----, 114 S.Ct. 1483, 1495-96, 128 L.Ed.2d 229, 250-51 (1994). While once a helpful source of guidance to Congressional intent, legislative history often may lead one astray. Given the narrow changes made to the provisions in question, we believe the quoted text to be little more than an attempt to alter the balance on the second front when someone could not win on the first. It is the intent of the enacting Congress, not that of a subsequent Committee or members of its staff, that controls. Oscar Mayer & Co. v. Evans, 441 U.S. 750, 758, 99 S.Ct. 2066, 2072-73, 60 L.Ed.2d 609 (1979).
 
 
 66
 Later in 1988, Congress again returned to the definition of a QMB. In the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100-647, 1988 U.S.C.C.A.N. (102 Stat.) 3342, Congress removed the requirement that a QMB not be covered under the state Medicaid program; the remaining definition thus was that the individual be eligible for Medicare and meet the income and resource limitations. Id. Sec. 8434(a), 1988 U.S.C.C.A.N. (102 Stat.) at 3805. Under this definition, essentially all dual eligibles and pure QMBs were covered.[11] Finally, in an act providing technical clean-up for the Medicare Catastrophic Coverage Support Act from earlier in the year, Congress also removed the old provision governing dual eligibles, 42 U.S.C. Sec. 1396a(a)(15). See Family Support Act of 1988, Pub.L. No. 100-485, Sec. 608(d)(14)(I), 1988 U.S.C.C.A.N. (102 Stat.) 2343, 2416. (Oddly, the repeal of the dual eligibles provision occurred before the expanded QMB definition was passed, so for some time there was not perfect harmony.) Thus, by the end of 1988, the QMB provision had been expanded, first to include a larger pool of "pure QMBs," and then to include the old dual eligibles, and the old dual eligibles provision was eliminated.
 
 E.
 
 67
 In 1989, Congress revisited the area tangentially and with more problematic commentary. The problem that it was facing involved assignment. In the Budget Reconciliation Act, Pub.L. No. 101-239, Sec. 6102, 1989 U.S.C.C.A.N. (103 Stat.) 2106, 2182, Congress required that payment for physicians' services "to any individual who is enrolled under [Medicare Part B] and eligible for any medical assistance (including as a qualified medicare beneficiary ... ) with respect to such services under a State [Medicaid plan] may only be made on an assignment-related basis." This prevents physicians from charging above the Medicare rate for the new expanded QMB community. The House report that accompanied the bill continues to indicate an awareness of states applying the Medicaid cap in Medicare reimbursement. After noting that up until this point, dual eligibles are effectively covered by the Medicaid assignment rule, the report notes that "[t]he Medicaid programs typically pay the Medicare coinsurance only to the extent that their payment, plus the Medicare payment, does not exceed what the Medicaid program would pay for the service in question." H.R.Rep. No. 247, 101st Cong., 1st Sess. 364, reprinted in 1989 U.S.C.C.A.N.1906, 2090. Describing the effect of the new provision, the report notes that "[i]t does not change the current policy regarding the amount which a Medicaid program must reimburse on such claims." Id.
 
 
 68
 Once again, we are faced with difficult legislative commentary that contradicts the settled understanding of the statute's provisions while not enacting provisions that could in any way alter or affect the substantive provisions discussed in the commentary. Once again, we feel that fidelity to what Congress actually passed, and not what the report later attempts to explain is allowed, requires us to discard this post-enactment material.
 
 
 69
 From 1965 through 1986, Congress established a framework, incrementally expanded, under which the substantive provisions were developed and amended. Our reading of the statute, and the contemporaneous legislative history, discloses to us clear Congressional intent that state copayments under the buy-in program for either dual eligibles or pure QMBs be, except for optional nominal charges under Sec. 1396a(a)(15) or later Sec. 1396o, complete. Whatever ambiguity appears facially in reading the provisions in question, and we do not believe there to be much for those willing to plunge into the morass, does not remain once the contemporaneous legislative history is examined. While it may be that some in Congress, or on its staff, have had a subsequent change of heart regarding the matter, the only honest way to change the law is to actually change the law, not to drop contrary language into committee reports addressing totally unrelated provisions.
 
 IV.
 
 70
 While it is not our duty as judges to establish policy but rather simply to use established tools of statutory construction to determine the meaning of the laws passed by others, we note that the result reached above is in accord with all common sense. While such harmony is not a prerequisite to the law, it is a serendipitous benefit when it occurs, particularly in a statutory framework as complex as the one with which we are here involved.
 
 
 71
 As noted at the outset, our central task is to understand whether the present QMB buy-in program should be characterized as being primarily a Medicare program or a Medicaid program, and we believe that a careful reading of the statute's evolution and related legislative history discloses that Congress, at all relevant points, viewed this plan as a straightforward extension of the Medicare program to Medicare Part B eligible individuals who were too poor to buy their way into this supplemental insurance program. In our view, it makes far more sense to call this a Medicare program that is being partly paid for with Medicaid funds rather than to call it a Medicaid program backing up federal Medicare program payments. Because the program covers pure QMBs, who definitionally are not eligible for regular Medicaid coverage, it is hard to say that this scheme is a Medicaid program when it includes such non-Medicaid-covered parties. Outside of the Medicare buy-in context, pure QMBs have no involvement with Medicaid whatsoever; they fall outside the income eligibility program, and, absent the statutory command to the states to expend Medicaid funds to purchase Medicare coverage for them, the states would not expend health care funds on them. Thus, it seems somewhat anomalous to say that this is a Medicaid program that includes people who are not otherwise eligible for Medicaid.
 
 
 72
 It also seems odd to call this a Medicaid program because in many instances the 80% federal reimbursement under Medicare is higher than the Medicaid fee cap, so that the amount reimbursed under Virginia's present plan is set not by the Medicaid figure but rather by 80% of the Medicare figure. Thus, if it is a Medicaid statute, it is one with both different participants and different reimbursement rates than the "normal" Medicaid program of the state.
 
 
 73
 Finally, it could be seen as a statute with Medicare as the primary payor and Medicaid as the payor of last resort. The problem with this approach is that it would make sense if the full Medicare amount were less than the Medicaid amount, so that we could say that the Medicare amount has been paid in full, and the Medicaid funds need not kick in. But that is not the case, and the figure used is not the full Medicare amount but rather the 80% federal payment amount. Under this conception, it is a Medicare statute with different, lower rates than the "normal" Medicare program.
 
 
 74
 Given all these complexities, it seems much more comprehensible that what Congress has constructed is an extension of the Medicare program, including both Parts A and B, that requires the states to pay any and all premiums, deductibles and copayments for the elderly poor, with the exception of the nominal charges allowed under Sec. 1396o. The federal government pays the same amount for all these participants as it does for any other Medicare participant. It seems logical to simply see this as an instance where, because of the poverty of the QMB, the state rather than the individual shoulders payment for the cost-sharing provisions of the Medicare program. While the state is expending extra money for the pure QMBs in either scenario, since absent the required buy-in program it would not have anything to do with them, the states are in a winning situation financially because they are able to buy dual eligibles into the Medicare program, and Medicare then pays at least 80% of the cost of the beneficiary's care when many if not all of those services otherwise would be financed through the state's Medicaid funding. The only question is how good a deal the states get. Under Virginia's approach, supported by DHHS, once Virginia pays the premium and coinsurance, it is often not required to pay anything more, because the Medicaid amount is lower than the 80% federal reimbursement. Under the Association's approach, Virginia is still required to pay the 20% copayment, for which federal matching funds are also available, that the beneficiary is required to pay.[12]
 
 
 75
 It also should be noted that there is simply no way around the fact that there are going to be two tiers of repayment involved here; the only question is where the dividing line is placed. Under Virginia's approach, service for all Medicare Part B beneficiaries except QMBs is repaid at 100% of the reasonable charge under the Medicare program. Service to QMBs, on the other hand, is repaid only at the Medicaid rate or 80% of the Medicare rate, whichever is greater. Service to pure Medicaid beneficiaries is paid at the Medicaid rate. Thus, the dividing line is essentially poverty: better payment goes to those serving the eligible "rich," while worse payment comes from serving the poor of whatever age.[13] Under the Association's approach, on the other hand, the dividing line is purely age: better payment goes to providers serving those 65 or older no matter their income, while worse payment goes to the poor who are younger. Neither is a palatable choice, but it is one that we are not called upon to make: the legislative history reflects a pervasive Congressional concern with protecting the health of older Americans, and our analysis of the statute's history confirms that Congress intended to provide maximum protection to the population of Americans 65 years of age or older, and that through the buy-in program, it established a mandatory program that guarantees that indigency should not affect an individual's participation in the Medicare Part B program. We thus join both of the other circuits that have passed on this question in holding that there can be no doubt but that the QMB is a Medicare enrollee, and that payment on her behalf must be made at the Medicare rate. Pennsylvania Medical Soc'y v. Snider, 29 F.3d 886 (3d Cir.1994); New York City Health & Hosp. Corp. v. Perales, 954 F.2d 854 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992).
 
 V.
 
 76
 Under the 1988 amendments to Virginia's state Medicaid Plan, "reimbursement will not be made directly to [rehabilitation] therapy providers for [rehabilitation] therapy services provided to Medicaid patients residing in long term care facilities...." Plan Amendment 88-08. Virginia adopted this amendment based on findings that the state had, on some occasions, been paying for such services twice, once to the long term care facility and once to the rehabilitation provider. After this amendment, payment of rehabilitation providers for services rendered to pure Medicaid patients comes not from the Virginia Department of Medical Assistance Services but rather is funnelled through the long term care facilities in which the patients reside. Long term care facilities receive a per diem payment for each Medicaid patient, and the payment to the rehabilitation service providers is bundled into that block payment. As to pure Medicaid patients, the Association does not contest this system of financing its constituents' services.
 
 
 77
 As to QMBs, however, although the Medicare reimbursement amount for rehabilitation services is greater than is that under Medicaid, there is no differentiation in the per diem reimbursement to the long term care facility based on whether the services provided are financed at the Medicare or Medicaid rate, so that the rehabilitation providers do not receive any additional reimbursement from the nursing homes for QMBs, thus vitiating the providers' right to receive the full reasonable charge for their services under Medicare. The Association points out that the rehabilitation services providers receive direct payment from the federal government to cover 80% of the Medicare Part B reasonable charge for services they provide to QMBs. Under the current scheme, however, which theoretically bundles the 20% copayment into the per diem amount the state pays to the nursing facilities, the service providers effectively receive nothing. The Association argues that payments for QMB services are Medicare payments rather than Medicaid payments, that the long term care facility is a stranger to the relationship, and that they are entitled to receive payment directly under the statute, rather than bundled through the nursing facilities as is the practice with pure Medicaid patients.
 
 
 78
 With respect to "pure" QMBs, such a bundling policy is not applicable. Pure QMBs are not "regular" Medicaid patients, and the hospital per diem simply does not encompass them. They are not considered "Medicaid patients" for these purposes. The Secretary seems, at least implicitly, to acknowledge this conclusion. See Br. for the Secretary of Health and Human Services, at 29-30.
 
 
 79
 The Secretary argues that as to dual eligibles, however, bundling is allowable. In support, it cites to 42 U.S.C. Sec. 1396a(a)(32), which requires that a state plan must "provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service," with only a few exceptions not relevant here. From this it argues that the nursing facility can be considered to be the institution providing such care or service, so that payment directly to the nursing facility is allowable. In support, it cites to the Medicaid statute and regulations that require that nursing facilities provide such services to Medicaid residents through their own employees or through an arrangement with an outside rehabilitation agency. 42 U.S.C. Sec. 1396r(b)(4)(A)(i).
 
 
 80
 As an initial matter, we note first the logical fallacy in the Secretary's analysis: just because one is required to see that service is provided does not make one the provider of the service. While the long term care facility is required to provide certain service under the Medicaid Act, it is not, in fact, the actual provider of the services in question. In fact, the federal government's payments are made not to the nursing facility but rather to the rehabilitation service providers directly. While the nursing facility may be required to provide the service under the Medicaid Act, in this instance it contracts with these third parties who "provide" the service.
 
 
 81
 Beyond this, our principal problem with the Secretary's analysis is that it relies too heavily on the premise that, as with the pure Medicaid patient, it is Medicaid, not Medicare, service that is involved here. As to the pure QMB population, the rehabilitation services that they receive from Association members are not "Medicaid services" because they are not Medicaid-eligible except insofar as the state is required to buy them into Medicare as a condition of its participation in the Medicaid program. As to the dual eligibles, who are both Medicare and Medicaid patients, the characterization is similarly difficult. While it is convenient that the Medicaid statute requires services similar to those being reimbursed here under Medicare, if such services were not required under Medicaid the Secretary's reasoning would fail because there would be no way to say that the nursing facility is required to provide them. The particular facts of this case thus cloud the picture to some extent: it is helpful to understand the fact that, in a situation in which Medicaid does not cover a certain service but Medicare does, the reimbursement is to the provider; the only characterization of the payment can be as a Medicare reimbursement. The Medicaid statute does not govern who the "provider" is in such circumstances, nor should it govern here. While the fact that these rehabilitation services are required under Medicaid means that the nursing facilities satisfy their Medicaid requirements, it is difficult to understand how that affects the characterization of the funding of these services or who is deemed the provider.
 
 
 82
 Virginia makes a similar argument, and it highlights the problem more acutely: it states that "Virginia recognizes no one as a Medicaid provider unless he has executed a written provider agreement with the Virginia Department of Medical Assistance Services." Br. of Appellant Kozlowski at 12. From this premise, Virginia argues that, since the Association's members do not have provider agreements, they cannot receive funds directly. Applying this theory generally suggests that any health service provider of whatever type who provides Medicare Part B services to QMBs will not be eligible for reimbursement of the 20% copayment from Virginia unless she also has executed a written Medicaid provider agreement with the state. Thus, under this approach, a provider who does not participate in both the Medicare and Medicaid programs, or who for whatever reason has not signed a written agreement with the State, cannot receive reimbursement of the Medicare Part B copayment because she is not a Medicaid eligible service provider. Simply speaking, this approach makes no sense, and converts a simple 20% copayment into a bureaucratic nightmare. Thus, while neither the Secretary's nor Virginia's argument causes many concerns when simply approached on the particular facts of the case, a full understanding of the inadequacy of each when viewed from a more general perspective undermines their analytic soundness. It seems largely irrelevant that the nursing facility is required to provide these services under Medicaid; the fact of the particular arrangement under Medicaid should not be of import in deciding whom to reimburse for Medicare procedures.
 
 
 83
 We are left to determine how Virginia appropriately complies with the requirement of 42 U.S.C. Sec. 1396a(a)(32) that it not pay "for any care or service provided to an individual ... to anyone other than such individual or the person or institution providing such care or service." Although Medicaid funds are in question, they are being used to pay the Medicare Part B copayment for services provided under the Medicare Act. As such, the proper approach looks not to the Medicaid statute but rather to the Medicare statute to determine who is the appropriate entity for payment.[14] After the 1989 amendments, payment under Medicare Part B for "physicians' services" for all QMBs may only be made on an assignment-related basis. 42 U.S.C. Sec. 1395w-4(g)(3)(A). Physicians' services are defined to include the type of rehabilitation services involved here. Id. Sec. 1395w-4(j). They are considered "outpatient physical therapy services" under 42 U.S.C. Sec. 1395x(p), which are services "furnished by a provider of services, a clinic, rehabilitation agency, or a public health agency." As rehabilitation agencies, the plaintiff's members fall within this definition and receive payment directly from Medicare carriers. They are the direct billers and should be the direct payees. This reasoning harmonizes the Medicaid requirement that payment only be made to the individual or service provider by finding that, as to Medicare reimbursement, it is the Medicare statute that governs whether the rehabilitation agency should be considered a service provider. Under that statute, the rehabilitation providers are the "providers" of services, not the long term nursing facilities in which the patients reside.
 
 VI.
 
 84
 For the reasons stated above, we are of the opinion that the judgment and order of the district court should be, and hereby are, affirmed.
 
 
 85
 AFFIRMED.
 
 
 86
 NIEMEYER, Circuit Judge, concurring in part and dissenting in part:
 
 
 87
 I concur with the rulings made in Part II of the majority opinion but with respect to the majority opinion's interpretation of the Medicare and Medicaid statutes, I respectfully dissent. I find myself in full agreement with the opinion's characterization of the statutes that:
 
 
 88
 There can be no doubt but that the statutes and provisions in question, involving the financing of Medicare and Medicaid, are among the most completely impenetrable texts within human experience. Indeed, one approaches them at the level of specificity herein demanded with dread, for not only are they dense reading of the most tortuous kind, but Congress also revisits the area frequently, generously cutting and pruning in the process and making any solid grasp of the matters addressed merely a passing phase.
 
 
 89
 Maj. op. at 1449-50. Yet, after engaging in that "dense reading of the most tortuous kind" and parsing these statutes for their meaning, I reach a different result.
 
 
 90
 While the majority opinion has courageously embarked on a survey of the amendments and legislative history of the Medicare and Medicaid statutes during the last 30 years and has striven to put forward a logical explanation for the various inconsistencies it identifies, it nevertheless admits in several places where two or more interpretations are possible that "[n]either interpretation is particularly satisfying." Maj. op. at 1454. Moreover, the majority opinion fails, in my judgment, to address satisfactorily the plain language of the core provisions that we must construe, i.e. 42 U.S.C. Secs. 1396a(a)(10)(VIII) & 1396a(n), and totally disregards legislative history developed during the 1988 and 1989 amendments.
 
 
 91
 The majority concludes erroneously, I submit, that because it can string together a reading of the text which supports its position, it has proven that "Congress has directly spoken to the precise question at issue," and thus satisfied the first inquiry under Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). In fact, I have reached the conclusion that there is another interpretation of the statutes, a hybrid of the majority's and the Secretary's, which has the most textual support and is more consistent with the overall regulatory scheme. But even this more convincing reading of the statute does not, I acknowledge, leave one confident that every ambiguity is resolved. In the end, I find that the most appropriate judicial response is to conclude that Congress has not spoken directly and unambiguously to the issue before us and that therefore we must defer to the interpretation of the agency charged with interpretation and enforcement of the statutes. Indeed, the fact that well-intentioned and intelligent experts at legal exegesis have arrived at three or four seemingly plausible readings of a particular text may be the best evidence that this interpretive puzzle has no definitive answer. Because the Secretary's reading of the statute, though different from my own, is nonetheless a reasonable and therefore a permissible one, I would defer to the agency and reverse the judgment of the district court.
 
 
 92
 * To begin with some background which may lend understanding to the more esoteric provisions at issue, I note that this case involves the interplay of two separate federal health care programs originally enacted in 1965, the Medicare Act, 42 U.S.C. Secs. 1395-1395ccc, and the Medicaid Act, 42 U.S.C. Secs. 1396-1396v. Medicare is an insurance program, funded and operated by the federal government, for those over the age of 65 and for those with specified disabilities. Medicare's coverage is divided into two parts. All eligible individuals who opt to participate in the program are entitled to benefits under Part A, which provides limited protection against the costs of certain hospital and related post-hospital care, home health service, and hospice care. 42 U.S.C. Sec. 1395c. Under Part B, eligible individuals may purchase supplemental insurance for more extensive health care benefits, including coverage for physician and out-patient services. Once an individual who chooses to enroll in Part B pays the appropriate premium and annual deductible, the federal government then pays 80% of what it determines to be the reasonable costs of covered services, leaving the individual responsible for paying the remaining 20%, known as the "coinsurance" payment. 42 U.S.C. Secs. 1395l 1395cc(a).
 
 
 93
 The Medicaid program, in contrast, is funded and operated by both the federal and state governments and its availability is based upon financial need, irrespective of age. Each state sets its own criteria for financial need, and in most cases the state threshold is less than the federal poverty level. A state is not required to participate in the program, but once it decides to do so, it must comply with a wide range of federal statutes and regulations. 42 U.S.C. Sec. 1396c. Each participating state must develop its own Medicaid plan, establishing a schedule of payment rates and methods for different types of medical services, 42 U.S.C. Sec. 1396a(a), and the plan must be approved by the Secretary of the Department of Health and Human Services, 42 U.S.C. Sec. 1396a(b). Those providing services to Medicaid patients must accept the established Medicaid rate as payment in full and may not demand additional payment from the patients themselves. 42 U.S.C. Sec. 1320a-7b(d). In virtually all cases, the approved Medicaid rate is less than the reasonable charge permitted under the Medicare Act. Depending upon the circumstances of the medical services, the federal government will reimburse the state between 50% and 83% of the cost of the services. 42 U.S.C. Sec. 1396d(b).
 
 
 94
 Many individuals, who are both poor and either elderly or disabled, qualify for both Medicare and Medicaid and are therefore known as "dual-eligibles." Because many of these individuals cannot afford to pay Medicare Part B premiums and because of the advantages of participation in the Part B program, the Medicaid Act has always permitted states to use Medicaid funds to enroll these "dual-eligibles" in Part B coverage. In 1986, Congress created a second class of persons eligible for Medicaid-financed participation in Part B of the Medicare Program, authorizing such coverage for those who, while not poor enough to qualify for Medicaid, nevertheless had incomes below a modest level set by the state, but not exceeding the federal poverty line. See 42 U.S.C. Sec. 1396d(p)(1). Those made eligible to participate in 1986 were referred to as "qualified medicare beneficiaries" or "pure QMBs."[1] While the 1986 version of the Medicaid Act gave states the choice whether to enroll pure QMBs in Part B of the Medicare Program, a 1988 amendment to the Medicaid statute made such enrollment mandatory by deleting the words "at the option of a State" from 42 U.S.C. Sec. 1396a(a)(10)(E).
 
 
 95
 Thus, the question presented in this case is not whether states are required to use Medicaid monies to enroll dual-eligibles and pure QMBs in Part B (because clearly they are required to do so), but whether they are required to pay all of the costs associated with Part B in full; or, stated otherwise, whether it would be consistent with the Medicaid Act for the states to cap their coinsurance and annual deductible payments at the approved Medicaid rate (or some other amount less than 100 percent) for a given item or service. As of January 1, 1991, Virginia began paying coinsurance and deductibles only to the extent that the Medicaid rate would pay for the services. In response, plaintiff Rehabilitation Association of Virginia, an organization representing providers of rehabilitation services in Virginia, brought this action to compel full payment of coinsurance and deductibles under Part B of the Medicare Program for all qualified Medicare beneficiaries, including dual-eligibles and pure QMBs.
 
 
 96
 In support of its position, the Rehabilitation Association relies on 42 U.S.C. Sec. 1396a(a)(10)(E), which requires that the state Medicaid plans provide "for making medical assistance available for medicare cost-sharing (as defined in Section 1396d(p)(3) of this title) for qualified medicare beneficiaries," with certain exceptions. Section 1396d(p)(3), in turn, defines "medicare cost-sharing" to include Medicare premiums, deductibles and coinsurance. According to the Rehabilitation Association, 42 U.S.C. Sec. 1396a(a)(10)(E), in combination with the definition of "medicare cost-sharing" in 42 U.S.C. Sec. 1396d(p)(3), should be read to require payment in full for all of these medical costs, thus prohibiting states from capping their payments at any amount less than 100 percent. The Rehabilitation Association notes that two other circuits have adopted this position. See Pennsylvania Medical Soc'y v. Snider, 29 F.3d 886 (3d Cir.1994), and New York City Health & Hospitals Corp. v. Perales, 954 F.2d 854 (2d Cir.1992)(by divided vote, with dissenting opinion). But see Haynes Ambulance Service, Inc. v. Alabama, 820 F.Supp. 590 (M.D.Ala.1993) (reaching opposite result), rev'd and remanded, 36 F.3d 1074 (11th Cir.1994).[2]
 
 
 97
 The United States Secretary of Health and Human Services and the Commonwealth of Virginia argue that the requirement that the state Medicaid plans make available funds for Medicare Plan B premiums, deductibles and coinsurance should not be read to mandate that such funds provide 100 percent reimbursement at the Medicare rate, but rather that payment may be made for Medicare services at the generally lesser Medicaid rate of reimbursement. They contend that the statutory provisions cited by the Rehabilitation Association address only the requirement that Medicaid funds be available for Medicare coinsurance payments and deductibles but not the amount of payment. They argue that the amount of these medical payments is set forth in a separate provision, 42 U.S.C. Sec. 1396a(n), entitled "Payment Amounts." That section permits a state to pay beyond the Medicaid rates, but does not mandate it. Section 1396a(n) provides that state plans for QMBs
 
 
 98
 may provide payment in an amount with respect to the service or item that results in the sum of such payment and any amount of payment made under [Medicare] with respect to the service or item exceeding the amount that is otherwise payable under the State [Medicaid] plan for the item or service for eligible individuals who are not qualified medicare beneficiaries.
 
 
 99
 (Emphasis added). According to the Secretary and Virginia, there would be no reason to use the permissive verb form "may provide" in Sec. 1396a(n) if Sec. 1396a(a)(10)(E) and Sec. 1396d(p)(3) mandated payment in full at the Medicare rate. The Secretary argues further that, even if we disagree with her interpretation, the relationship of the various sections at least creates an ambiguity. Therefore, she argues we should uphold her position for the independent reason that Congress has vested the responsible agency with the authority to interpret the two acts.
 
 
 100
 Relying largely upon the logic of the Second Circuit's decision in Perales,[3] the district court granted summary judgment to the Rehabilitation Association, and the Secretary and Virginia noticed this appeal.
 
 
 101
 For the reasons that follow, I believe that neither the Secretary nor the Rehabilitation Association has the better argument. In my view, each is only partially correct. While the language and history of the statute plainly supports the Secretary's interpretation of the states' payments obligation for pure QMBs, the Rehabilitation Association provides the better reading of the states' obligation for dual-eligibles.
 
 II
 
 102
 The analysis must begin with the text of the applicable provisions as they currently exist, and in particular with the core provision of the Medicaid Act which establishes and defines the contours of the state buy-in program, 42 U.S.C. Sec. 1396a(a)(10)(E). That provision requires states that participate in the Medicaid program to make Medicaid monies available for "medicare cost-sharing" as defined in 42 U.S.C. Sec. 1396d(p)(3). The definition of "medicare cost-sharing" in Sec. 1396d(p)(3) lists four categories of costs, including premiums, deductibles and coinsurance payments, for which patients covered by Medicare Part B are normally held responsible. Reading Sec. 1396a(a)(10)(E) and Sec. 1396d(p)(3) in a vacuum, one might conclude, as the majority opinion does, that they combine to mandate that states use Medicaid funds to provide reimbursement for the full amount of all costs associated with Medicare Part B, including the full amounts of deductibles and coinsurance.
 
 
 103
 But the majority's conclusion cannot be maintained in the presence of the exceptions clause to Sec. 1396a(a)(10), which states:
 
 
 104
 except that ... (VIII) the medical assistance made available to a qualified medicare beneficiary described in section 1396d(p)(1) ... who is only entitled to medical assistance because the individual is such a beneficiary shall be limited to medical assistance for medicare cost-sharing ..., subject to the provisions of subsection (n) of this section....
 
 
 105
 42 U.S.C. Sec. 1396a(a)(10)(VIII) (emphasis added). The exceptions clause directs attention to a separate provision in Sec. 1396a entitled "Payment Amounts," which specifies the amount of payments that a state must make under the Medicaid program for Medicare cost-sharing. See 42 U.S.C. Sec. 1396a(n). That provision uses the permissive language "may" to allow states to make coinsurance payments for QMBs above the approved Medicaid rate, thus implying that state plans are equally free not to make payments above the Medicaid rate. The role of Sec. 1396a(n) is simply to authorize, but not require, the states to pay an amount in excess of the Medicaid rates for that class of QMBs described in Exception VIII.
 
 
 106
 I find no difficulty in rejecting the Rehabilitation Association's reading that the Sec. 1396a(n)'s sole purpose is to clarify that states are indeed permitted to do what Sec. 1396a(a)(10)(E) requires them to do. Even the majority opinion concedes that this reading is not "particularly satisfying," since the Rehabilitation Association fails "to explain why the states needed permission to break the Medicaid fee cap for QMBs when Congress didn't apparently think before this time that such permission was needed." Maj. op. at 1454. One is hard pressed to explain why Congress would make an action mandatory for states in one section and still feel the need to clarify, in a separate section linked to the first by the words "except that," that the states had permission to follow Congress' mandate.
 
 
 107
 I agree with the Secretary that the plain language of Sec. 1396a(n) requires a reading that states may provide payment in amounts exceeding those otherwise mandated under the Medicaid statute. But what neither the parties nor the majority acknowledges is that the authorization given by Sec. 1396a(n) applies only to pure QMBs and not to dual-eligibles. The plain language of Exception VIII, quoted above, demands this conclusion. That clause, which directs the reader to Sec. 1396a(n), explicitly limits its own operation to cases where a state gives medical assistance to "a qualified medicare beneficiary ... who is only entitled to medical assistance because the individual is such a beneficiary." 42 U.S.C. Sec. 1396a(a)(10)(VIII) (emphasis added). Congress added the highlighted language in 1988, in the same bill in which it expanded the definition of "QMB" to cover both pure QMBs and dual-eligibles. See Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100-647, Secs. 8434(a), 8434(b)(1), 102 Stat. 3342, 3805. And pure QMBs, who are by definition ineligible for Medicaid, are only "entitled to medical assistance" (i.e. Medicaid monies) because they are considered "qualified medicare beneficiaries." By contrast, dual-eligibles are otherwise entitled to medical assistance because they are otherwise eligible for the entire panoply of Medicaid benefits. By taking pains to add this language, Congress intended to continue treating the payment obligations of the two groups differently, despite combining them into a single definitional category for other purposes.[4]
 
 
 108
 Distinguishing the treatment of QMBs and the treatment of dual-eligibles is consistent with the approach Congress took before 1988. When enacted in 1986, Sec. 1396a(n) applied only to pure QMBs. By adding to Exception VIII the qualifying clause highlighted above in 1988, Congress manifested its intent that Sec. 1396a(n) remain applicable only to pure QMBs. That Congress wished to continue treating pure QMBs and dual-eligibles differently is not surprising given the fact that the two groups are not similarly situated. Indeed, dual-eligibles are by definition poorer than pure QMBs, and thus I think the scheme most in line with Congressional intent is the one in which the states may ask for a greater financial contribution from the group that is better able to contribute.
 
 
 109
 Additional textual support for this interpretation is provided by two provisions which the majority puzzlingly overlooks. The first is the "part or all" language in Exception II, also to Sec. 1396a(a)(10). See 42 U.S.C. Sec. 1396a(a)(10)(II). This clause states that "provision for meeting part or all of the cost of deductibles, cost sharing, or similar charges under [Medicare Part B] ... for individuals eligible for benefits under such part, shall not ... require the making available of any such benefits, or the making available of services of the same amount, duration, and scope, to any other individuals." 42 U.S.C. Sec. 1396a(a)(10)(II) (emphasis added). This language shows that Congress contemplated that states might provide only a portion of the costs associated with enrolling individuals in Medicare Part B. This militates against the majority's and the Rehabilitation Association's insistence that the Medicaid Act mandates that states provide all costs, in full.
 
 
 110
 Second and even more convincing is the existence of a provision which limits the imposition of cost-sharing charges on qualified Medicare beneficiaries to certain "nominal" amounts, as defined by the Secretary's regulations. See 42 U.S.C. Sec. 1396a(a)(14) (requiring that enrollment fees, premiums, deductions, cost sharing, or similar charges, may be imposed under state Medicaid plans only as provided in section 1396o ); 42 U.S.C. Sec. 1396o (a) (with some exceptions, requiring that "any deduction, cost sharing, or similar charge" imposed on qualified Medicare beneficiaries be limited to a "nominal" amount as defined by regulation, or "twice the nominal amount" for non-emergency services received in a hospital emergency room). Without determining the definition of "nominal," it is sufficient to identify these sections as further and convincing proof of Congress' expectation that states would not always provide 100 percent reimbursement for the patients they enrolled in Medicare Part B insurance. These provisions, requiring that any such costs imposed on QMBs be "nominal," would be rendered mere surplusage if the majority's opinion were correct because the majority believes that QMBs should never have to pay such nominal costs. I hasten to add, however, that if my interpretation were to be adopted by the Secretary and imposed on the states, states such as Virginia would no longer be able to cap their contributions at the Medicaid rate, where the difference between the state Medicaid rate and 100 percent of the federal Medicare fee was more than "nominal."
 
 
 111
 To summarize, then, the Medicaid Act's core buy-in provision, Sec. 1396a(a)(10)(E), together with the definition of cost-sharing in Sec. 1396d(p)(3), if read in a vacuum, might be interpreted to mandate that the states cover the full amount of all the costs associated with Medicare Part B. But, as I have already pointed out this is a faulty interpretation in light of Exception VIII, which applies only to pure QMBs. As for dual-eligibles, I can find no provision which qualifies or otherwise creates an exception to full payment of all their costs. Thus, I conclude that as to dual-eligibles, the majority and the Rehabilitation Association are correct; the states may not, given the text of the Medicaid Act in its current form, ask dual-eligibles to share the costs of Medicare Part B, including coinsurance payments. But as to pure QMBs, the states may ask them to shoulder the responsibility for costs exceeding what the state would normally pay for a service under its Medicaid plan, at least up to a "nominal" amount.
 
 
 112
 Confining myself solely to the statutory language, I therefore must conclude that Medicaid's core buy-in provision, Sec. 1396a(a)(10)(E), cannot be read in a vacuum and that Exception VIII explicitly exempts one group of qualified Medicare beneficiaries, what we refer to as "pure QMBs," from the 100 percent reimbursement mandate. While participating states are authorized under the Medicaid Act to provide payment beyond Medicaid rates to pure QMBs in assisting them to participate in Medicare Part B, they are not required to do so. See 42 U.S.C. Sec. 1396a(n). In certain circumstances, states may cap their levels of reimbursement at the Medicaid rates, but only if doing so leaves the patient with no more than a "nominal" cost. See 42 U.S.C. Sec. 1396o (a)(3). As for dual-eligibles, the statute does not seem to exempt them from the 100 percent reimbursement mandate of Sec. 1396a(a)(10)(E), and thus I agree that adequate textual support exists for this aspect of the majority's interpretation of the Act.
 
 III
 
 113
 I believe that the historical treatment of the states' payment obligations for dual-eligibles and QMBs, within the framework of an evolving statutory scheme, provides further corroborative evidence of the congressional intent that I have derived from the statutory language itself. This historical treatment, which in many instances is ambiguous, is nevertheless relevant because earlier versions of the two acts explicitly address the issues presented to us in this case.
 
 
 114
 As originally enacted in 1965, the Medicaid Act permitted states to pay on behalf of certain dual-eligibles the entire costs associated with Medicare Part B. If states chose not to make such payment in full, the Medicaid Act required that payment be made "on a basis reasonably related ... to such individual's income or his income and resources." Social Security Amendments of 1965, Pub.L. No. 89-97, Sec. 1902(a)(15), 1965 U.S.C.C.A.N. 305, 373 (codified prior to repeal at 42 U.S.C. Sec. 1396a(a)(15)). Thus, a state which chose not to pay the entire Medicare Part B insurance for dual-eligibles was nonetheless responsible for a portion of the payment, but the portion for which it was responsible bore no relation to the Medicaid rate.
 
 
 115
 In 1986, Congress decided to create a second class of persons eligible for Medicaid-financed enrollment in the Medicare Part B insurance program. Specifically, it gave the states the option of enrolling in Medicare Part B certain individuals--pure QMBs--who were not poor enough to be eligible for Medicaid but still had income and resources below a defined level. Omnibus Budget Reconciliation Act of 1986 ("OBRA"), Pub.L. No. 99-509, Sec. 9403(b), 100 Stat. 1874, 2053-54 (codified as amended at 42 U.S.C. Secs. 1396a(a)(10)(E) & 1396d(p)(1)). Significantly, Congress treated the states' payment obligations to each of the two groups who were eligible for the buy-in program separately and distinctly. Instead of simply extending the means test of old Sec. 1396a(a)(15) to pure QMBs, Congress explicitly excluded pure QMBs from application of that subsection, leaving the means test to apply only to dual-eligibles. See OBRA Sec. 9403(g)(4)(A), 100 Stat.2056 (amending Sec. 1396a(a)(15) prior to its repeal).[5]
 
 
 116
 What Congress intended in 1986 as a substitute for the means test for pure QMBs is the key to this case. For in 1986 Congress enacted essentially the same network of provisions governing the payment obligations for states which opted to buy-in pure QMBs as exists today, with two caveats: today, (1) states are required to buy-in pure QMBs, and (2) the definition of "qualified medicare beneficiary" has been expanded. But as for the amount of a state's payment obligation, the exact same textual analysis I applied to the current statutory scheme also applies to the statutory language as it existed in 1986. To summarize that analysis, while the definition of Medicare cost-sharing included a list of all of the costs associated with Medicare Plan B, the definition was immediately followed by an exceptions clause which stated that the states may provide costs in an amount exceeding the Medicaid rate, implying clearly that states were not required to provide the full amount of all the costs.[6]
 
 
 117
 The majority opinion is hard pressed to come up with an alternative reading of these provisions as they were passed in 1986. The majority, as I noted above, is highly skeptical, and justifiably so, of the Rehabilitation Association's position that Exception VIII merely clarifies that the states have permission to do what the Act requires them to do. Recognizing the weakness of the Rehabilitation Association's position, the majority attempts to derive a third interpretation, consistent with its position, by closely analyzing the wording of Sec. 1396a(n). In that section, states are told that they "may provide" payments for services for QMBs through the buy-in program in excess of what is "otherwise payable under [Medicaid] for the item or service for eligible individuals who are not qualified medicare beneficiaries " (emphasis added). The natural reading of the quoted phrase is that it compares the amount paid for pure QMBs under Medicare Part B with the amount paid normally for Medicaid patients under the state Medicaid plan, indicating that the former may exceed the latter. The majority chooses instead to read it as comparing the amount paid for pure QMBs under Medicare Part B with the amount paid for dual-eligibles under Medicare Part B.[7] "This understanding of the statute suggests simply that the State may pay more for [pure] QMB payments under Plan B than it pays for dual eligibles under Plan B." Maj. op. at 1454.
 
 
 118
 The majority's position is unconvincing for several reasons. First and foremost, the reading suggested by the majority, like that of the Rehabilitation Association, would result in a system where the states would be required to make larger payments for pure QMBs than for dual-eligibles, while, by definition, dual-eligibles are poorer than pure QMBs. I would agree with the majority (though with less understatement) that this notion seems "somewhat incongruous." Maj. op. at 1454. For it is wholly unclear to me why Congress would create a system forcing dual-eligibles to contribute to their coinsurance payments, while the states would be required to pick up the entire cost of coinsurance for pure QMBs. One cannot simply state that this was an unintended anomaly of the new statutory regime, because, as noted above, the 1986 amendments specifically excluded pure QMBs from application of old Sec. 1396a(a)(15). If Congress intended that the states have a different payment obligation for pure QMBs than for dual-eligibles, as it clearly did, the rational inference is that Congress intended that states have a lesser obligation for pure QMBs.
 
 
 119
 Second, it makes little sense to read the requirement that states "mak[e] medical assistance available for medicare cost sharing," 42 U.S.C. Sec. 1396a(a)(10)(E), to require full payment of coinsurance for pure QMBs when that subsection, when it was drafted in 1986, allowed such payments "at the option of a State." See OBRA Sec. 9403(a)(3), 100 Stat.2053. If a state had the option of deciding whether or not it would even pay Medicare Part B premiums for pure QMBs at that time, one must assume that it also had discretion as to the amount of coinsurance that it would pay.
 
 
 120
 Third, the majority's textual analysis of Sec. 1396a(n) raises more questions than it answers and is subject to the same criticism that the majority applies to the Rehabilitation Association's reading of that provision. If, as the majority believes, the 1986 version of the Act contained one section which clearly allowed states to provide less than 100 percent reimbursement for dual-eligibles according to a needs-based standard, and another section which clearly mandated 100 percent reimbursement for pure QMBs (i.e., the all-or-nothing option), Sec. 1396a(n) would be rendered mere surplusage. It is utterly implausible, I submit, to believe that Congress would create a new section in the Act solely to acknowledge that it is permissible for states to do what Congress requires them to do in other sections.[8]
 
 
 121
 Thus, I cannot conclude that the operative sections cited by the majority and the Rehabilitation Association, as enacted in 1986, required full payment of coinsurance for pure QMBs. The difficulties with the majority's and the Rehabilitation Association's reading of the 1988 amendments are apparent. If Congress did not intend for Sec. 1396a(a)(10)(E) to require full payment for pure QMBs in 1986, how can we assume that it intended for such payment in 1988 with no statement in the statute to that effect? This would be a substantial change in the law. To assume that those new state obligations are created by implication, without some expressed indication to that effect in the statute, is a greater leap than I am prepared to make. Moreover, my interpretation of the 1986 version of the statute is fully consistent with the changes Congress adopted in 1988. Though alluded to above, it is worthwhile to once again review what the 1988 amendments actually did.[9]
 
 
 122
 In 1988, Congress made a number of significant changes in the treatment of dual-eligibles and pure QMBs. First, it removed the phrase "at the option of a State" from 42 U.S.C. Sec. 1396a(a)(10)(E), thus obligating states to enroll their pure QMBs in Part B of the Medicare program. See Medicare Catastrophic Coverage Act of 1988, Pub.L. No. 100-360, Sec. 301(a)(1), 102 Stat. 683, 748. Also in 1988, Congress eliminated the distinction between dual-eligibles and pure QMBs by changing the definition of "qualified medicare beneficiary" to include dual-eligibles. See Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100-647, Sec. 8434(a), 102 Stat. 3342, 3805. As a consequence, Congress repealed 42 U.S.C. Sec. 1396a(a)(15) which had been applicable only to dual-eligibles.
 
 
 123
 It would be misleading to conclude from the new singular definition of "qualified medicare beneficiary," however, that Congress intended the coinsurance payment obligation of the states to be identical for dual-eligibles and pure QMBs. In fact, in the 1988 amendments Congress explicitly added language to the exceptions clause attached to Sec. 1396a(a)(10)(E) indicating that Sec. 1396a(n) continued to apply solely to pure QMBs, as it did in 1986. The combination of the congressional repeal of the needs-based test for dual-eligibles in old Sec. 1396a(a)(15) and the restriction of the "may provide" language in Sec. 1396a(n) to apply only to pure QMBs is sufficient evidence that Congress intended to require full reimbursement for dual-eligibles--but for them only.
 
 
 124
 Thus, the history of the 1986 and 1988 amendments leads to the following conclusions. The statutory scheme prior to the 1988 amendments required coinsurance payments for dual-eligibles to the extent that the beneficiary could not pay, according to some "reasonable" scale of need as determined by the state. 42 U.S.C. Sec. 1396a(a)(15) (repealed in 1988). If my reading of the 1986 amendments is correct, they did not require any such payments for pure QMBs. Thus, the 1988 amendments effectively changed the states' payments obligation for only one of the two groups. The payment obligation for pure QMBs remained flexible,[10] while the payment obligation for dual-eligibles went from a needs-based standard to a requirement of 100 percent reimbursement.
 
 IV
 
 125
 I remain with the firm belief that mine is the most accurate interpretation of the statutes. Notwithstanding that conviction, I am also prepared to acknowledge that the statutory language may not give rise to a single conclusive interpretation and that one cannot derive a definitive interpretation from the nature of the multitudinous amendments made over the years. While the proper limit of our judicial function is coterminous with our power to interpret, I am willing to concede there are circumstances that fall beyond the limits of reason. In this instance, therefore, I am not prepared to order a construction in conflict with the view of the agency happily charged with these statutes' interpretation. Accordingly I conclude it best, in light of all the circumstances, that we defer to the agency.
 
 
 126
 Congress has given the Secretary the power to administer both the Medicare and Medicaid Acts, see 42 U.S.C. Secs. 1395ff(a), 1396a(b), and deference is due to the Secretary's interpretations of them under the principles announced in Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Those principles, which are well known but merit repeating here, are stated quite simply:
 
 
 127
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 128
 * * * * * *
 
 
 129
 If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
 
 
 130
 Id. at 842-44, 104 S.Ct. at 2781-82 (emphasis added) (footnotes omitted). See also, Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702, 111 S.Ct. 2524, 2537, 115 L.Ed.2d 604 (1991) ("[I]t is axiomatic that the Secretary's interpretation need not be the best or most natural one by grammatical or other standards.... Rather, the Secretary's view need be only reasonable to warrant deference.").
 
 
 131
 The deference mandated by Chevron has a number of justifications. It insures that agencies--which are more politically accountable than federal courts--have final say on matters of policy not resolved by Congress.
 
 
 132
 While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices--resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.
 
 
 133
 Chevron, 467 U.S. at 865-66, 104 S.Ct. at 2793. In addition, the judicial deference to agency interpretations mandated by Chevron "increases the prospect of uniform federal regulatory law and reduces the burden on the Supreme Court of insuring that uniformity." Laurence A. Silberman, Chevron--The Intersection of Law & Policy, 58 Geo. Wash. L.Rev. 821, 824 (1990). Finally, Congress may be better equipped to draft legislation with knowledge of how an agency, with a track record of interpretation and hard-earned expertise in the field, is likely to read its language. See Antonin Scalia, Judicial Deference to Administrative Interpretations of Law, 1989 Duke L.J. 511, 517 (1989). Thus, where we are not convinced that Congress has spoken to a matter, we should grant discretion to an agency because of its special competence to fill the statutory gap.
 
 
 134
 Where an agency is given discretion to administer a "complex and highly technical regulatory program," it is entitled to an even greater degree of deference from the courts. BethEnergy Mines, 501 U.S. at 697, 111 S.Ct. at 2534. The provisions of the Medicaid and Medicare Acts at issue here are just the sort of complicated statutes that are entitled to this special deference. See Mowbray v. Kozlowski, 914 F.2d 593, 598 (4th Cir.1990) ("Judicial deference is especially appropriate in the area of welfare administration."). I believe that the courts must acknowledge their lack of expertise in such complicated fields and, in the face of an unresolvable ambiguity, accord extra deference to the appropriate agency which has the greater familiarity with the statutory scheme at issue.
 
 
 135
 In this case, I would also grant extra deference to the position of the Secretary because of the major financial ramifications of our decision. Affidavits submitted by the Director of the Virginia Department of Medical Assistance Services state that the reading urged by the Rehabilitation Association would cost an additional $10 million annually. Assuming that federal matching funds are available for half of that total, Virginia would be forced to budget an extra $5 million annually just to cover the costs inherent in the Rehabilitation Association's interpretation, at a time when Virginia already projects significant budget shortfalls. According to representations from counsel at oral argument, almost half of the states in the country have similar limitations upon coinsurance payments, so that a ruling that full payment is mandatory could have an even greater fiscal impact. With so great a budgetary change at stake, I am convinced that we should be especially sure of the result Congress intended before acting, and failing that confidence, we should defer to the federal and state agencies which regularly and continuously operate under the statutes' terms.
 
 
 136
 In short, while I continue to believe that my statutory interpretation is more persuasive than that urged by the majority, the fact that the majority opinion and my opinion--both of which are purportedly grounded on a rational interpretation of the statutes--arrive at significantly different results surely manifests an actual ambiguity and an almost self-evident lack of clarity in the statutes. In these circumstances, I believe that the court has no other alternative but to defer to the agency charged with interpretation and enforcement of the statutes, particularly in light of the major budgetary implications. Accordingly, I would reverse the judgment of the district court, and therefore I respectfully dissent.
 
 
 
 [1]
 Specifically, QMBs are defined as individuals who are eligible for Medicare Part A benefits, have incomes not exceeding the federal poverty line, and whose resources do not exceed twice the amount set as the maximum for receiving benefits under the supplemental security income program. 42 U.S.C. Sec. 1396d(p)(1)
 
 
 [2]
 Although the buy-in program originally only extended to dual eligibles, it was extended in the 1980s to include pure QMBs as well, as discussed below
 
 
 [3]
 For example, say that for a particular service, the reasonable charge under Medicare is $100. The federal government reimburses $80 (assuming the deductible has been exhausted). If the Medicaid rate for that service is $90, does the state have to pay $20 or $10? And if the Medicaid rate for that service is $75, does the state pay $20 or nothing?
 
 
 [4]
 We note in passing the incongruity of characterizing this as a Medicaid program when the pure QMBs are definitionally not eligible for Medicaid assistance
 
 
 [5]
 Neither the Secretary nor the Association addresses the hypothetical situation in which the Medicaid fee is greater than the full Medicare reasonable charge. Under the Secretary's theory, the state presumably would pay the greater amount; when pressed at oral argument on this point, the attorney for Virginia declared that it would certainly comply with this counterfactual scenario if it ever occurred, and that it would not insist that the Medicare amount capped its payment requirement
 
 
 [9]
 The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect
 
 
 [6]
 Whatever the answer as to the amount of the State's payment, it should be noted that the buy-in requirement did not apply to all dual eligibles. Under Sec. 102 of the 1965 law, the Secretary was authorized to enter into buy-in agreements only as to Medicaid beneficiaries who were receiving cash assistance from the states, not from the entire pool of Medicaid beneficiaries. See 1965 U.S.C.C.A.N. at 334. This was codified at 42 U.S.C. Sec. 1395v. The 1967 Amendment broadened this provision to allow buy-in agreements for all dual eligibles
 
 
 [7]
 Beside this commentary, other portions of the Senate report confirm our view that Congress understood that state payments under Part B, and now Part A, if less than total had to be keyed to the dual eligible's income and resources. See 1967 U.S.C.C.A.N. at 3019 (discussing comparability requirement problem and exception to allow states to "meet[ ] part or all of the deductibles, cost sharing, or similar charges under part B"); id. at 3136 (same)
 
 
 [8]
 According to the accompanying House Report, only one state had decided to avail itself of the optional approach created under the 1986 provisions
 
 
 [9]
 It also did some clean up, including providing a slightly cleaner definition of what constitutes the medicare cost-sharing that the state must provide to QMBs. Id. Sec. 301(d), 1988 U.S.C.C.A.N. (102 Stat.) at 749. While the definition is more elegantly drafted, it does not change the contents in any significant way except as to payments for prescribed drugs
 
 
 [10]
 Thus, the introduction to the report stated that "States would be required to pay the Medicare premiums, deductibles and coinsurance for all Medicare enrollees with incomes at or below the Federal poverty guideline and assets at or below twice the Supplemental Security Income guidelines." H.R.Rep. No. 105(II), 100th Cong., 2d Sess. 36, reprinted in 1988 U.S.C.C.A.N. 857, 859. Later, in describing treatment of dual eligibles, the report notes that "States also pay Medicare deductibles and coinsurance on behalf of their dual eligibles." Id. at 57, 1988 U.S.C.C.A.N. at 880. And in describing the effect of the new mandatory QMB buy-in requirement, it states that
 the States would be required to pay the Medicare premiums, deductibles, and coinsurance for all elderly and disabled individuals.... States would not be required to provide these individuals the full range of Medicaid benefits that they offer to categorically or medically needy beneficiaries; instead, they would be required only to pay Medicare cost-sharing on their behalf.
 Id. at 60, 1988 U.S.C.C.A.N. at 883.
 
 
 [11]
 The House Conference Report makes this explicit:
 The conference agreement clarifies that individuals who, as of January 1, 1989, will be mandatorily eligible for coverage of their Medicare cost-sharing (qualified Medicare beneficiaries) are individuals who are entitled to Medicare, whose income meets specified standards, and whose resources do not exceed twice the amount allowed under the SSI program, whether or not they are otherwise eligible for Medicaid.
 H.R. Conf. Rep. No. 1104, 100th Cong., 2d Sess. 284, reprinted in 1988 U.S.C.C.A.N. 5048, 5344.
 
 
 [12]
 An outstanding question, which the Secretary tries to avoid, concerns the gap, under the Secretary's and Virginia's approach, between the state's reimbursement up to the Medicaid fee and Medicare's full reasonable charge. Under their approach, up to 20% of the Medicare reasonable charge is not paid by the states under the buy-in. Obviously, if the beneficiary is still liable for it, the entire purpose of the program is undermined. If the buy-in is treated as a Medicare program, so that the state is required to pay the full 20% difference, the question is moot
 
 
 [13]
 Of course, pure QMBs are not considered "poor" by state Medicaid standards, since they do not qualify for Medicaid; this leaves the anomalous situation where the pure QMBs are eligible for Medicare coverage and not eligible for Medicaid coverage, but are treated as Medicaid patients, but not Medicare patients
 
 
 [14]
 Because the appropriate statute is the Medicare Act rather than the Medicaid Act, we find it unnecessary to consider the arguments both sides make concerning the First Circuit's analysis as to the appropriate "provider" under the Medicaid Act in Danvers Pathology Associates v. Atkins, 757 F.2d 427 (1st Cir.1985). That case did not involve either dual eligibles or QMBs, and was strictly confined to an interpretation of the Medicaid statute
 
 
 [1]
 In keeping with the terminology of the majority opinion, I will refer to those who met the 1986 definition of "qualified medicare beneficiary" as "pure QMBs." As noted, infra, in 1988 Congress changed the official definition of "qualified medicare beneficiary" to encompass both pure QMBs and dual-eligibles. To avoid confusion, I keep the terminology of the two mutually exclusive classifications--dual-eligibles and pure QMBs--distinct throughout
 
 
 [2]
 Subsequent to the argument of this case, the Eleventh Circuit issued an opinion essentially adopting the position of the Second and Third Circuits in Perales and Snider, reversing the Alabama district court
 
 
 [3]
 The majority opinion, in affirming the district court's judgment, does not rely, quite properly I believe, upon the argument raised by the Rehabilitation Association and relied on by Perales that the Secretary's policy violates the Medicare Act by denying to health care providers the full reasonable value of their services
 
 
 [4]
 Interestingly, the recent Eleventh Circuit opinion is the only other opinion which has acknowledged this crucial piece of language which Congress inserted into the exceptions clause in 1988. See Haynes, 36 F.3d 1074, at 1076-77. The Haynes court agrees that this language is intended to distinguish pure QMBs from dual-eligibles, but then fails, without explanation, to follow through on its observation and recognize the implication that the exception clause's reference to "subsection (n)" is meant only to apply to pure QMBs
 
 
 [5]
 In 1986, Congress amended Sec. 1396a(a)(15) by inserting "are not qualified medicare beneficiaries" after "older who." Thus, prior to its repeal in 1988, Sec. 1396a(a)(15) required a state Medicaid plan to--
 In the case of eligible individuals 65 years of age or older who are not qualified medicare beneficiaries (as defined in Sec. 1396d(p)(1) of this title) but are covered by either or both of the insurance programs established by [Medicare], provide where, under the plan, all of any deductible, cost sharing, or similar charge imposed with respect to such individual under the insurance program established by [Medicare] is not met, the portion thereof which is met shall be determined on a basis reasonably related ... to such individual's income or his income and resources.
 (Emphasis added).
 
 
 [6]
 The same additional textual supports outlined above also existed in 1986. See 42 U.S.C. Secs. 1396a(a)(10)(II), 1396a(a)(14), and 1396o (a)
 
 
 [7]
 The majority achieves this interpretation by reading "eligible individuals" to mean (i) individuals eligible for the buy-in program, rather than (ii) individuals eligible for Medicaid. Thus, "eligible individuals who are not qualified medicare beneficiaries" would refer logically to the other category of patients who are eligible for the buy-in program, namely dual-eligibles. See slip op. at 1454
 
 
 [8]
 The Majority's textual analysis is also technically flawed because it would create a glitch in the current version of Sec. 1396a(n). Section 1396a(n) reads today exactly as it did in 1986. Congress has made no changes to its wording, although in 1988 it did expand the definition of "qualified medicare beneficiary." The Majority therefore presumably remains firm in its position that the phrase "eligible individuals" in section 1396a(n) refers to (i) individuals eligible for the buy-in program, rather than (ii) individuals eligible for Medicaid. See n. 7, supra. Unfortunately, this renders the rest of the section meaningless, as the clause "eligible individuals who are not qualified medicare beneficiaries" would refer to an empty set. As of 1988, when Congress expanded the definition of "qualified medicare beneficiary" to include pure QMBs and dual-eligibles, all individuals eligible for the buy-in program are considered qualified Medicare beneficiaries
 Thus, I am confident that the natural reading of Sec. 1396a(n) was correct in 1986 and is correct today.
 
 
 [9]
 In addressing the meaning of the 1988 amendments, the Secretary urges that we consider the House Report which appears to approve limiting the coinsurance payment for QMBs to the Medicaid rate. See H.R.Rep. No. 100-105(II), 100th Cong., 2d Sess. 61, reprinted in 1988 U.S.C.C.A.N. 857, 884. That report provides:
 It is the understanding of the Committee that, with respect to dual Medicaid-Medicare eligibles, some states pay the coinsurance even if the amount Medicare pays for the service is higher than the State Medicaid payment rate, while others do not. Under the Committee bill, States would not be required to pay the Medicare coinsurance in the case of a bill where the amount reimbursed by Medicare--i.e., 80 percent of the reasonable charge--exceeds the amount Medicaid would pay for the same item or service. However, if a State chooses to pay some or all of the coinsurance in this circumstance, Federal matching funds would, as under current law, be available for this cost.
 (Emphasis added). Even though that aspect of the report appears to be commenting on the practice under the 1986 amendments and does not explain the particular changes accomplished by the 1988 amendments, I would not entirely reject the import of this expressed congressional understanding, as does the majority opinion, because that commentary implicates a budgetary concern of some magnitude which had to be taken into account in adopting the 1988 amendments. I agree with the majority, however, that such legislative history must be reviewed cautiously.
 
 
 [10]
 Subject to the caveat that any cost sharing charged imposed could only be "nominal in amount." See 42 U.S.C. Sec. 1396o (a)(3)